## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

**DONTA J.[1],**

      **Plaintiff,**

**v.**                                                   **CIVIL CASE NO.: 2:20cv131-RGD-DEM**

**ANDREW SAUL,**
**Commissioner of Social Security,**

      **Defendant.**

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Donta J. ("Donta" or "Plaintiff") seeks judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. Plaintiff's pleadings raise multiple assignments of error in the decision by the Administrative Law Judge ("ALJ") that heard his claim. He claims that the ALJ was not properly appointed pursuant to the Appointments Clause of the U.S. Constitution. He also argues that the ALJ failed to explain the reasons for discounting certain medical evidence and other testimony, and did not analyze relevant listings. Pl.'s Br. (ECF No. 14). This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure. For the reasons stated below, this report recommends that the final decision of the Commissioner be affirmed.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

## I.    PROCEDURAL BACKGROUND

On August 22, 2016, Plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), alleging disability beginning October 2, 2001 as a result of Blount's disease and high blood pressure.  (R. 291, 298, 320).  The Commissioner initially denied his application on October 28, 2016, (R. 200-09), and upon reconsideration on August 30, 2017. (R. 181-87). Plaintiff then requested an administrative hearing.  After multiple continuances for Plaintiff to obtain counsel, the hearing was conducted on June 9, 2019.  (R. 42).

On July 9, 2019, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act and denied his claim for disability benefits.  (R. 20-34).  The Appeals Council denied review of the ALJ's decision on October 18, 2019, (R. 8-14), and again on January 16, 2020, (R. 1-7), thereby making the ALJ's decision the final decision of the Commissioner. Pursuant to 42 U.S.C. § 405(g), Plaintiff filed this action, on March 9, 2020, seeking judicial review of the Commissioner's final decision.  This case is now before the Court to resolve the parties' cross-motions for summary judgment.

## II.    FACTUAL BACKGROUND

Plaintiff's application originally alleged a disability onset of 2001, coinciding with the time at which he stopped working.  He amended the disability onset to 2016 during the ALJ hearing. (R. 46, 162, 318).  At the time of the amended onset in 2016, Plaintiff was thirty-six years old, a younger individual under Agency rules.  20 C.F.R. § 404.1563.  He had a high school education, but no past relevant work experience, having stopped full-time work around 2001, in his early twenties. (R. 43, 309).

2

## A.    Medical and Treatment History

Because Plaintiff's knee pain is chronic, both parties directed the court to medical records beginning in 2013, three years before his amended onset date.  In March of that year, Plaintiff presented to Ambulatory Care Center ("ACC") with complaints of right knee pain for "the last couple of months."  (R. 414).  He stated the pain bothered him throughout the day and was worse with physical activity.  (R. 416).  He reported his history of Blount's Disease, including prior corrective surgery, but stated he took no medication for pain.  (R. 415).  On examination, he had no clubbing, cyanosis, or edema; no crepitus in the left knee, but crepitus in the right.  (R. 416).  He was 5'10" tall and weighed 377 lbs.  He was referred for orthopedic follow-up, and returned to ACC in June and again in August 2013.  (R. 422, 428).  During the August visit, he noted pain since he was eight years old, which was now getting worse.  (R. 430).  He reported on a previous consult with an orthopedic surgeon who offered steroid injections, which he declined.  (Id.)  He stated that Advil helped with his pain.  (Id.)  Plaintiff was referred back to orthopedics and counseled to lose weight and stop smoking.  (Id.)

On March 13, 2014, Plaintiff returned to ACC.  His history on this visit was significant for "osteoarthritis from Blount's Disease."  He was taking Tylenol for his pain, and the orthopedist with whom he had consulted did not feel surgical management was indicated.  (R. 434).  Plaintiff reported no relief from physical therapy.  On examination, he had "pain-limited extension" in both legs, especially on the right.  (R. 435).  He was prescribed medication for pain and again counseled on diet and exercise.  (Id.)  His physical examination that date noted no clubbing, cyanosis, or edema in his lower extremities.  He was continued on his current medication.  (R. 443-44).  This was Plaintiff's last visit to ACC and was followed by a two-year gap in the medical record.

3

In October 2016, Plaintiff underwent an MRI of his right knee, which showed "[m]oderately pronounced arthritic changes with tricompartmental marginal spurring," and "chronic angular deformity of the proximal tibia." (R. 472). The radiologist's impression was of "overall moderate arthritic changes of the right knee." (Id.) In December 2016, Plaintiff was seen at Hampton Roads Community Health Clinic ("HRHC") where he again complained of right knee pain, which he described as having "slowly progressively worsened." (R. 480). He stated that he feels pain every day. He had "never fallen because of this, but had stopped walking for a minute." He denied any "redness, loss of range of motion, or effusion." (Id.) On exam, Plaintiff had a full range of motion, no clubbing, cyanosis, or edema in his lower extremities. (R. 481). He was diagnosed with right knee pain and prescribed ibuprofen, ice and heat, as well as stretching and strengthening exercises. (Id.) He was also referred for another MRI and orthopedic consult. (Id.)

A second MRI was performed August 29, 2017. This MRI showed advanced tricompartmental osteoarthritis, moderate joint effusion with synovitis, a moderate sized Baker's Cyst with synovitis, and possible loose body at posterior or medial joint. (R. 486-87). During a follow-up visit at HRHC for unrelated conditions in September 2017, Plaintiff was again referred back to ACC or VCU for evaluation and treatment of "a meniscal tear, moderate popliteal cyst, and severe right knee arthritis." (R. 502). Plaintiff returned to HRHC two weeks later for follow-up, reporting that his knee pain was still eight out of ten, but he had not attended the referral appointment. He stated that he now intended to pursue the referral. (R. 498). Following this visit, however, there was another eighteen-month gap in the medical records until April 8, 2019, when Plaintiff saw Dr. Semet Mebrahtu at Ghent Station Medical Associates. (R. 576). Plaintiff related to Dr. Mebrahtu a history of hypertension, pre-diabetes, and right knee pain. (R. 577). He stated he could not walk past 50 yards without pain, and described the pain as constant, nine on a scale

4

of ten. (Id.) He also reported complaints of lower back pain and stated that he took ibuprofen for his pain which did not help. (Id.) On examination, Plaintiff had good range of motion, but with some crepitus in his right knee. (R. 578). He had negative straight leg raising tests bilaterally, 5/5 muscle strength, and normal reflexes in both lower extremities. (Id.) Dr. Mebrahtu diagnosed chronic right knee pain and prescribed meloxicam and extra-strength Tylenol. (R. 578).

Plaintiff returned to Dr. Mebrahtu requesting stronger medication for his right knee pain. (R. 573). He reported the meloxicam was not working, and that his pain was still eight out of ten and radiating down his leg, producing numbness and tingling. (R. 573-74). His exam on this date again showed good range of motion, with no crepitus, no tenderness to palpation, 5/5 muscle strength, and normal reflexes in both lower extremities. (R. 575). He was prescribed Tramadol for his pain and referred for another MRI. (Id.) He was also encouraged to use a heating pad, Icy Hot or Tiger Balm for his pain, and to discontinue the meloxicam. (Id.)

In May 2019, Plaintiff had another MRI of his right knee. This one revealed "[s]evere tricompartmental degenerative changes with degenerative tears of the menisci, areas of Grade IV chondromalacia in the medial and lateral compartments and Grade III chondromalacia of the retropatellar cartilage. Tricompartmental osteophyte formation. Lipoma arborescens which is associated with severe osteoarthritis. Grade II sprains of the MCL and ACL. Sprain of the patellar tendon. Chronic ACL tear." (R. 565-66). There do not appear to be any records following this 2019 MRI.

### Medical Opinion Testimony

The ALJ also evaluated opinion testimony from one treating physician, a consultative examiner, and two Agency physicians who evaluated the record. On October 25, 2016, consultative examiner Richard Hoffman, M.D. met with Plaintiff in connection with his

application for benefits. (R. 476). During the visit, Plaintiff reported that his pain had significantly worsened since a prior consultative exam in 2010. (Id.) He had gained significant weight and stated that he could not be on his feet for more than ten-fifteen minutes at a time, afterwards having to take a prolonged break and then only able to return to standing for a few minutes until he needs another break. (Id.) He stated this affected his ability to perform almost all tasks that require him to be on his feet. He described being independent "for the most part, but needs some assistance washing his back and sometimes getting in and out of the tub." (Id.) He stated he believed he was only able to walk about 150 feet without stopping to rest, and climb stairs, but only with "extreme pain." (Id.) Dr. Hoffman's examination revealed significant tenderness at his right knee joint, a valgus deformity of at least thirty degrees, mild instability of the right knee joint, and an antalgic gait. (R. 477). Dr. Hoffman observed he had severe difficulty supporting his weight on the right leg, resulting in him being unable to heel-to-toe walk, and had difficulty squatting, but no difficulty from standing from forward flexion, and some difficulty standing from a seated position. (Id.) He reported a mild degree of dyspenea at the end of his range of motion and gait maneuvers. (Id.) Dr. Hoffman opined that Plaintiff could stand and walk for up to one and a half hours in an eight-hour workday but should be able to sit for six hours during an eight-hour workday with normal breaks. (R. 478). He also found severe limitations with standing, bending, stooping, crouching, and climbing. (Id.) Dr. Hoffman believed Plaintiff would benefit from an assistive device, but found no limitations in fine manipulation, and also believed Plaintiff could lift ten pounds occasionally and twenty pounds rarely but would have to avoid at operating at any height and would have difficulty driving in an employment setting. (Id.)

In addition to Dr. Hoffman, one of Plaintiff's treating physicians, Dr. Mebrahtu, also completed a residual functional capacity ("RFC") evaluation. Dr. Mebrahtu's evaluation was signed May 15, 2019 and reflects her treatment which began April 8, 2019. (R. 550-53). She related her opinions in a check-the-box evaluation form prepared at the request of Plaintiff's counsel. Dr. Mebrahtu checked boxes indicating that Plaintiff's pain would "constantly" interfere with the attention and concentration needed to perform simple tasks and that he would be incapable of even "low stress" jobs due to knee pain, writing "due to knee pain unable to tolerate work stress." (R. 551). Dr. Mebrahtu believed Plaintiff could walk a half block without rest or severe pain and sit two hours and thirty minutes. (Id.) According to the completed form, she believed Plaintiff would have to take unscheduled breaks three times per day, and have his legs elevated eighty percent of the time if he were working in a sedentary position. (R. 552). Dr. Mebrahtu also noted that Plaintiff did not require a cane or other assistive device for walking or standing, could occasionally lift up to twenty pounds, and had no limitations with reaching, handling or fingering. (R. 552-53). Finally, Dr. Mebrahtu believed Plaintiff would likely be absent from work four or more days per month as a result of his impairments or treatment and that cold temperatures might make his knee pain worse. (R. 553).

Finally, during the application process, Plaintiff's records were also reviewed by two agency physicians, Tony Constant, M.D. and Donald Williams, M.D. in October 2016 and August 2017, respectively. (R. 168-70, 193-95). Dr. Constant determined that Plaintiff could frequently lift or carry twenty pounds, stand and walk for about two hours, and sit for six hours in an eight-hour workday. (R. 169-70). He found Plaintiff could occasionally climb ramps/stairs, but never ladders/ropes/scaffolds. (R. 169). He also found Plaintiff could occasionally stoop, kneel, and crouch, but never crawl. (Id.) Dr. Williams, who issued a separate opinion at the reconsideration

7

stage of review, essentially agreed with Dr. Constant's opinion on the limitations imposed by Plaintiff's impairments. (R. 193-95).

**B.    The ALJ Hearing**

Following multiple continuances for Plaintiff to retain counsel, an ALJ hearing was held on June 5, 2019, with Plaintiff represented by counsel. (R. 41). At the commencement of the hearing, the ALJ addressed Plaintiff's counsel regarding a pre-hearing objection which raised the question of whether the presiding ALJ was properly appointed following the Supreme Court's decision in <u>Lucia v. Securities and Exchange Commission</u>, 138 S. Ct. 2044 (2018). (R. 42-43). The ALJ noted this objection but believed it had been rendered moot by his "reappointment." (R. 42). Counsel did not concede the objection was mooted and observed that no court had yet addressed the issue. The ALJ recognized it was preserved for later argument. (<u>Id.</u>)

The ALJ also inquired whether counsel believed the requirements of any listing were met, and counsel directed him to listings at 1.02, for major dysfunction of a joint. (R. 43). The ALJ observed that the Plaintiff "is walking, doesn't use a cane, doesn't use a walker," suggesting that the Plaintiff could not meet the limitation of the listing that he be "unable to ambulate effectively." (R. 44). Counsel then previewed the witness testimony, suggesting that the Plaintiff had to use a scooter in the grocery store and stated that he believed the evidence would demonstrate Plaintiff's inability to ambulate effectively. (<u>Id.</u>)

i.    <u>Plaintiff's Testimony.</u>

The Plaintiff testified that he lived with his mother and step-father in a two-story home, where his bedroom is on the second floor. (R. 47-48, 60). He drives and does not use a handicap placard. (R. 49). He has a high school education but has no source of income. (R. 49).

Plaintiff stated that he "can't do anything," and mostly stays home to rest his right knee. (R. 50). He weighed 380 pounds and has tried unsuccessfully to lose weight. (R. 52). He described his past medical visits, stating that doctors did not recommend surgery, as the doctors didn't see anything wrong with this knee. He did say he had received a previous cortisone shot. (R. 50). Plaintiff testified that he had not had any falls due to his knee pain but stated that it sometimes "gives out on me," and he has to stop and sit down, elevating his leg. (R. 53). When asked how far he could walk, Plaintiff stated "like 30 feet, 30 yards." (R. 54). He stated that he does drive, goes shopping, visits his girlfriend (who also resides in a second-floor apartment). (R. 62-63). But he also stated that the stairs "kill me," and he has to elevate his leg when he arrives. (R. 63). He has not been prescribed a cane or a walker but testified that he requires a scooter to get around during his grocery shopping. (R. 58).

Although he stated that he did "nothing" at home, he also testified that he did his own laundry, made his bed, cooked his own food, and occasionally dusted and vacuumed. (R. 59-60). But he also testified that he could not walk to the 7/11 which was just down the street from his home, and could not attend a grave side funeral for a family friend because the location was "too far off the road," the ground wet and not level. (R. 64-65).

    ii.    Testimony of Amber T.

The ALJ also examined Plaintiff's girlfriend, Amber T. She has dated Plaintiff for five years and sees him almost every day. (R. 62, 72, 76). She stated that they mostly watched sports together on TV, occasionally cooked together, and went to restaurants once in a while. (R. 73-75). Amber testified that when they went out she did most of the driving. (R. 75-76). She confirmed that Plaintiff used a scooter in the grocery store, and if none were available, would lean on the shopping cart. (R. 77). She confirmed that Plaintiff could not walk as far as her home from his

home, which she described as "right around the corner." (R. 76). She testified that she had never seen Plaintiff fall due to his pain but had witnessed him "stop abruptly" in pain, and thereafter, limp if his knee was bothering him. (R. 77). She described their activities together as mostly sedentary – with Plaintiff watching TV, playing video games, and helping with the cooking by cutting vegetables from a sitting position. (R. 74, 79). She also testified that when they travelled, Plaintiff would frequently have to stop and stretch as a result of his knee pain.

     iii.    Testimony of Barbara Byers, Vocational Expert.

     During the hearing, the ALJ also considered the testimony of a Vocational Expert ("VE"). The ALJ posed a hypothetical involving a person of Plaintiff's age, education, and work experience, who was capable of sedentary work that allowed for occasional stooping, kneeling or crouching, but did not involve climbing ladders or crawling, or work around unprotected heights or dangerous machinery. He also suggested limitations to only simple repetitive and routine tasks. (R. 81). In response to which the VE stated that such a person would be able to perform unskilled, sedentary jobs, such as a food and beverage order clerk, sedentary assembler, and document preparer. (R. 82). The ALJ then asked the VE to confirm that if the same hypothetical person were absent without excuse more than two times per month or off for more than fifteen percent of each day that would preclude all work, and she stated that it would. (R. 82). The VE also testified that her descriptions of employment were consistent with the Dictionary of Occupational Titles ("DOT"). (R. 84). When questioned by Plaintiff's counsel, the VE stated that these jobs might require walking up to two hours each day, but that would be at the worker's discretion, noting the jobs were "primarily performed seated." (R. 85). She also testified that elevating the leg with a small stool up to twelve inches was generally permitted, but if the leg needed to be raised to "heart level" that would preclude work. (R. 84).

### III.   STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of New York v. NLRB, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla" of evidence but may be somewhat less than a preponderance.  Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citing Hays, 907 F.2d at 1456).  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)."  Id. (citation omitted). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed.  Perales, 402 U.S. at 390 (quoting 42 U.S.C. § 405(g)).  Thus, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law.  Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### IV.   ANALYSIS

To qualify for disability insurance benefits under sections 416(i) and 423 of the Social Security Act, 42 U.S.C. §§ 416(i), 423, an individual must meet the insured status requirements of

11

these sections, be under the age of sixty-five, file an application for disability insurance benefits and a period of disability, and be under a "disability" as defined in the Act.  42 U.S.C. §§ 416(i), 423.

The Social Security Regulations define "disability" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 404.1505(a); see also 42 U.S.C. §§ 423(d)(1)(A), 416(i)(1)(A).  To meet this definition, a claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy.  20 C.F.R. § 404.1505(a); see 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered in determining whether a claimant has a disability.  The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The five questions which the ALJ must answer are:

1. Is the individual involved in substantial gainful activity?

2. Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or his physical or mental ability to do the work activities?

3. Does the individual suffer from an impairment or impairments which meet or equal those listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (a "listed impairment" or "Appendix 1")?

4. Does the individual's impairment or impairments prevent him or his from performing his or his past relevant work?

5. Does the individual's impairment or impairments prevent him or his from doing any other work?

An affirmative answer to question one, or a negative answer to question two or four, results in a determination of no disability. An affirmative answer to question three or five establishes disability. This analysis is set forth in 20 C.F.R. §§ 404.1520 and 416.920. The burden of proof and production rests on the claimant during the first four steps, but shifts to the Commissioner on the fifth step. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).

When conducting this five-step analysis, the ALJ must consider: (1) the objective medical facts; (2) the diagnoses and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age. Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967) (citing Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962)). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## A.    The ALJ's Decision

During the hearing, after a discussion of Plaintiff's dated work history, and his date last insured of 2001, Plaintiff withdrew his request for Disability Insurance Benefits and thus the ALJ did not address the insured status requirements of the Social Security Act. (R. 23, 43, 44). In considering whether Plaintiff was disabled, the ALJ made the following findings under the five part analysis: (1) Plaintiff had not engaged in substantial gainful activity since his amended alleged onset date of August 22, 2016; (2) Plaintiff had severe impairments of obesity, osteoarthritis of the knee, hypertension, and Blount's disease; (3) his combination of impairments did not meet one of the listed impairments in Appendix 1, specifically, any of those listed under Section 1.00 related to the musculoskeletal system; (4) Plaintiff had the RFC to perform sedentary work, only occasionally involving stooping, kneeling, crouching, or climbing stairs, but not involving

climbing ladders, crawling, or working around unprotected heights or dangerous machinery. (R. 26-27). Finally, at step five, the ALJ noted that Plaintiff had no past relevant work, but he did identify jobs which exist in significant numbers in the national economy which Plaintiff could perform. (R. 28-33).

Plaintiff now challenges the appointment of the ALJ pursuant to the Appointments Clause of the U.S. Constitution. Additionally, he argues that the Commissioner did not: (1) properly credit the opinions of a treating physician, Dr. Mebrahtu, and a consultative examiner, Dr. Hoffman; (2) properly credit testimony from Plaintiff or his girlfriend; (3) properly consider whether Plaintiff's impairments met or equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Pl.'s Br. (ECF No. 12). The Court considers each argument below.

**B.    The ALJ Who Heard and Decided Plaintiff's Claim Was Properly Appointed Pursuant to the Appointments Clause of the Constitution.**

Prior to the ALJ hearing, Plaintiff's counsel sent a letter raising a challenge to the presiding ALJ's appointment status based on the Supreme Court's decision in Lucia v. Securities and Exchange Commission, 138 S. Ct. 2044 (2018). (R. 42, 373). In his opinion, the ALJ found the argument "lacks merit by virtue of the Acting Commissioner of Social Security's July 16, 2018 ratification . . . and her approval of any appointment as her own under the Constitution." (R. 24).

In Lucia, the Supreme Court held that ALJs of the Securities and Exchange Commission are "Officers of the United States" within the meaning of the Appointments Clause of the United States Constitution. Lucia v. SEC, 138 S. Ct. 2044, 2055 (2018). The Appointments Clause prescribes that such "Officers of the United States" must be appointed by the President of the United States, a court of law, or a head of a department. Id. at 2051 (citing U.S. CONST. art. II, § 2., cl. 2). The Court's decision in Lucia did not address whether ALJs in other federal agencies were also Officers within the meaning of the Appointments Clause. But in response to this

14

decision, the then-Acting Commissioner of the Social Security Administration ("Administration") ratified the appointment of the Administration's ALJs  on July 16, 2018 "[t]o address any Appointments Clause questions involving Social Security claims, and consistent with guidance from the Department of Justice." SSR 19-1p, 2019 WL 1324866, at *2 (Mar. 15, 2019).  Thus, the ALJ presiding over Plaintiff's hearing noted that he believed the Lucia claim "lacked merit" by virtue of the Acting Commissioner of Social Security's having "reappointed" him. (R. 24, 42). He noted, however, that the objection had been preserved.

Plaintiff now argues that the then-Acting Commissioner's ratification was "not an appropriate means of appointment because she was neither the President of the United States, a court of law, or the head of [a] department," but was merely acting as an "interim official." Pl.'s Br. (ECF No. 14, at 12).  Neither party has directed me to binding authority addressing the argument raised here and I find it unpersuasive.

At the time of the ALJ's ratification, the then-Acting Commissioner, who had previously been the Deputy Commissioner of Operations, was serving as Acting Commissioner pursuant to the Federal Vacancies Reform Act ("FVRA"). See 5 U.S.C. § 3345, et seq.; Dwayne D. v. Berryhill, No. TMD 17-3809, 2019 U.S. Dist. LEXIS 47693, at *n.1 (D. Md. Mar. 22, 2019) (noting that Berryhill became the Acting Commissioner of Social Security on April 17, 2018 (citing 5 U.S.C. § 3346(a)(2); Patterson v. Berryhill, No. 2:18-cv-00193-DWA, slip op. at 2 (W.D. Pa. June 14, 2018) (explaining that Berryhill's term as Acting Director should have ended in November 2017, but that following the nomination of Andrew Saul to be Commissioner, she resumed her role as Acting-Commissioner pursuant to 5 U.S.C. § 3346(a))); see also Memorandum of December 23, 2016, Providing an Order of Succession Within the Social Security Administration, 81 Fed. Reg. 96337, 96337 (Dec. 30, 2016) (authorizing the "Deputy

Commissioner of Operations" to "act as and perform the functions and duties of the office of the Commissioner of Social Security" in the event the Commissioner and Deputy Commissioner have both died, resigned, or become unable to perform the functions and duties of the Commissioner). Under the FVRA, if an officer of an executive agency who is required to be appointed by the President with the advice and consent of the Senate dies, resigns, or is unable to perform the functions and duties of the office, an acting officer may perform "the functions and duties of the vacant office." 5 U.S.C. § 3345(a). A vacant office can include an agency head. See id. § 3349c (listing officers, not including agency heads, to whom the FVRA does not apply). As the head of the Administration has the authority to appoint ALJs and acting heads can perform the functions and duties of the office, then-Acting Commissioner Berryhill's ratification of the Administration's ALJs was an appropriate means of appointment.

Additionally, in related litigation of cases preceding the ratification courts have repeatedly recognized that the Supreme Court's decision in Lucia was unlikely to result in a prolonged avalanche of cases, precisely because ratification of previously appointed ALJs by the then-Acting Commissioner stemmed the possibility of subsequent litigation. See, e.g., Probst v. Saul, 980 F.3d 1015, 1024 (4th Cir. 2020) ("[N]ow that the Commissioner has ratified the appointments of all ALJs as her own, there are no new Appointments Clause challenges brewing in SSA cases."); Probst v. Berryhill, 377 F. Supp. 3d 578, 583 (E.D.N.C. Mar. 22, 2019) ("[F]ollowing issuance of the Lucia decision, the Social Security Administration addressed the issue of challenges to its ALJ appointments by the Commissioner's express ratification of the appointments." (citing SSR 19-1p, 2019 WL 1324866, at *2 (Mar. 15, 2019))). Accepting Plaintiff's argument would mean rejecting this common understanding that the then-Acting Commissioner's ratification addressed potential Appointments Clause challenges and subject the Social Security Administration to a new

accumulation of cases whereby claimants could argue that any ALJ whose appointment was ratified by the July 2018 ratification remained improperly appointed. Absent authority contravening the apparent plain meaning of the FVRA, I will recommend the court reject this new theory.

## C. The ALJ Properly Considered and Explained the Weight Given to Plaintiff's Treating Physician Opinions and the Consultative Examiner.

Plaintiff next argues that the ALJ improperly discounted the opinions of one of his treating physicians, Dr. Semet Mebrahtu, and a consultative examiner, Dr. Hoffman. The ALJ specifically assigned "little weight" to Dr. Mebrahtu's opinion in which she opined that Plaintiff would be unable to tolerate even low stress jobs due to knee pain. (R. 31). Likewise, he found Dr. Hoffman's opinions too restrictive and gave them little weight.

Ordinarily the ALJ will give a treating physician's opinion "controlling weight" if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see also Lewis v. Berryhill, 858 F. 3d 858, 867 (4th Cir. 2017).[2] But the ALJ has "discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)); see also 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996) ("[I]f a

---

[2] "Effective March 27, 2017, the SSA rescinded § 404.1527 and § 416.927 and implemented a new rule governing the consideration of medical opinions." Parsons v. Berryhill, No. 3:18cv1107, 2019 WL 2252023, at *10 n.3 (S.D.W. Va. May 2, 2019) (citing 20 C.F.R. § 404.1520c (2017)). "Under the new rule, the SSA will consider the persuasiveness of all medical opinions and evaluate them based upon the two most important factors of supportability and consistency." Id. (citing 20 C.F.R. §§ 404.1520c(a), (c)(1)-(2)). Because the regulation does not have retroactive effect, the Court will review the ALJ's decision under the old rule codified by 20 C.F.R. §§ 404.1527 and 416.927, in effect when Plaintiff filed his claim in August 2016. Id.

physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."). The ALJ also need not accept the opinion from a treating source if the source opines on whether a claimant is disabled, as the determination of disability is an "administrative finding[]" reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d).

If a treating physician's medical opinion is not given controlling weight, then the ALJ will look at a variety of factors to evaluate the opinion including (1) the length of the treatment relationship, (2) the nature and extent of the relationship, (3) whether there is relevant evidence to support a medical opinion, (4) the consistency of the medical opinion with the record as a whole, and (5) the physician's specialization. 20 C.F.R. §§ 404.1527(c), 416.927(c); see also Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005). Additionally, when the ALJ determines that the treating physician's opinion should not be given controlling weight, the ALJ is required to provide an explanation for the weight given to the opinion. 20 C.F.R. § 404.1527(c)(2). But courts generally should not disturb an ALJ's decision as to the weight afforded a medical opinion "absent some indication that the ALJ . . . dredged up 'specious inconsistences,' or . . . failed to give a sufficient reason for the weight afforded a particular opinion." Dunn v. Colvin, 607 F. App'x 264, 267 (4th Cir. 2015) (quoting Scivally v. Sullivan, 966 F.2d 1070, 1077 (7th Cir. 1992) (citing 20 C.F.R. § 404.1527(d)).

Plaintiff asserts that the ALJ incorrectly assigned "little weight" to Dr. Mebrahtu's May 15, 2019 disability evaluation. Pl.'s Br. (ECF No. 14, at 13-15). In the questionnaire comprising her opinion, Dr. Mebrahtu reported a range of restrictions for Plaintiff, including that he could only sit, stand, or walk for less than two hours during an eight-hour workday, and that he would need three unscheduled breaks each day. (R. 551-52). In analyzing Dr. Mebrahtu's opinion, the

ALJ reviewed the very brief history of her treatment records. He noted that her treatment began only a month prior to the report, and that the report itself referenced no clinical findings or objective signs supporting the restrictions. (R. 31, 550). In fact, Dr. Mebrahtu's contemporaneous examinations of Plaintiff revealed chronic knee pain treated with medication, but no tenderness to palpation or crepitus in his right knee, 5/5 muscle strength in both legs, and normal reflexes. (R. 575). The ALJ cited to Dr. Mebrahtu's own treatment notes which reflected no medication side effects – while the medical source statement suggested his pain medication "can cause" drowsiness and nausea." (R. 550). Thus, the ALJ discussed the medical evidence he relied upon in concluding Dr. Mebrahtu's opinion was due little weight.

Plaintiff also argues that the ALJ failed to consider all factors listed in 20 C.F.R. § 404.1527, but instead discredited Dr. Mebrahtu's opinions based solely on "cherry picked" medical evidence. Pl.'s Br. (ECF No. 14, at 15) (citing Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005)). But in this case, the ALJ explicitly addressed most of the factors required by the regulations, such as Dr. Mebrahtu's failure to support her opinions by citation to medical/clinical findings as shown by the ALJ's discussion of Plaintiff's treatment, (R. 31), and the brief length and nature of her treatment of Plaintiff, which (as the ALJ observed) began barely a month before her opinion on disability. The ALJ also stated that Dr. Mebrahtu's restrictions appeared to be based largely on Plaintiff's subjective complaints. (R. 31, 550). Additionally, the ALJ was "under no mandate to conduct a factor-by-factor analysis." Vest v. Colvin, No. 2:15-CV-05886, 2016 WL 5334668, at *3 (S.D.W. Va. Sept. 22, 2016) (citing Jones v. Comm'r of Soc. Sec., No. 1:10-CV-185, 2012 WL 1085658, at *12 (N.D.W. Va. Mar. 30, 2012); see also Standards for Consultative Examinations and Existing Medical Evidence, 56 Fed. Reg. 36,936 (Aug. 1, 1991) (explaining that "not every factor will apply in every case" and "certain factors . . . will sometimes

take precedence over other[s]"); Carrol v. Saul, No. 1:18-CV-02273, 2020 WL 1242618, at *4 n.1 (D.N.C. Mar. 16, 2020) (citing cases); Hardy v. Colvin, No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W. Va. Sept. 30, 2014) ("[T]he regulations require the ALJ to consider the six factors, but do not demand that the ALJ explicitly discuss each of the factors.").

Plaintiff's citation to Lewis v. Berryhill, 858 F.3d 858 (4th Cir. 2017), while understandable, is ultimately unpersuasive. Lewis is facially similar to the instant case. As here, the ALJ in Lewis discounted treating physician opinions, and only partially credited plaintiff's testimony regarding the limiting effects of pain. But, factual differences between the two cases undermine Lewis's persuasive force in this case.

Unlike this case, Lewis involved a claimant with "a myriad of severe medical impairments," who had "endured multiple surgeries," including the removal of a rib, as well as "epidural injections, two supraspinatus nerve blocks, and a radio frequency ablation of her supraspinatus nerve." Id. at 869. The treating physician, whose opinion the ALJ declined to credit had treated Lewis for "four years essentially on a bi-weekly basis." Under these circumstances, the Fourth Circuit found the ALJ's "cursory" analysis of the physician's opinion, which spanned only four lines, was insufficient and precluded meaningful judicial review on appeal. Id. at 870.

By contrast, Plaintiff here has chronic knee pain exacerbated by his obesity. Despite a long history of complaints, he has never treated his knee condition with anything other than pain relievers. In addition, Dr. Mebrahtu, whose opinion on his limitations was discounted, had seen him only twice in a six-week span and her contemporaneous medical records failed to support the severe restrictions in her check-the-box opinion statement. Also relevant – Plaintiff here has long gaps in treatment of any kind, and zero work history. This is in striking contrast to the claimant in Lewis. Moreover, the ALJ's analysis of Dr. Mebrahtu's opinion in Plaintiff's case was not cursory.

He provided specific details regarding the reasons for discounting the opinions and those reasons align with the medical record, and Fourth Circuit precedent which applies to his evaluation of the treating physician's opinion. As a result, his opinion was supported by substantial evidence and fully consistent with Lewis.

The ALJ also properly considered the opinion of the consultative examiner, Dr. Hoffman, based on that opinion's supportability and consistency. As with Dr. Mebrahtu, the ALJ assigned little weight to Dr. Hoffman's medical source statement. He found it "too restrictive," and concluded the opinion relied to much on Hoffman's single examination of the Plaintiff which the ALJ observed was inconsistent with his recent submissions to the agency and medical records. (R. 31). The ALJ specifically cited Plaintiff's self-report of activities of daily living which he submitted in September 2016, approximately one month before Dr. Hoffman's consultation. In his ADL report, the ALJ noted that Plaintiff stated he lived at home in a second story bedroom, did not use a cane or walker, prepared his own meals and performed simple household chores. (R. 31, 165). The ALJ also cited more recent (post examination) records which show Plaintiff had good range of motion, 5/5 muscle strength and good reflexes. (R. 31, citing 575, 578). Finally, the ALJ observed that Plaintiff's treatment record had been "somewhat sporadic," also suggesting Claimant was less limited than Dr. Hoffman opined. (R. 31).

In sum, the ALJ provided sufficient reasons for the weight he gave to Dr. Mebrahtu and Dr. Hoffman's opinions. He properly considered the persuasiveness of both opinions based largely on their supportability and consistency in accordance with 20 C.F.R. §§ 404.1520(c)(a), (c)(1) – (2). His conclusion to afford them little weight is supported by substantial evidence.

**D.      The ALJ Properly Evaluated Witness Testimony Regarding Plaintiff's Pain and Limitation.**

Plaintiff next argues that the ALJ failed to properly evaluate his subjective complaints of pain and limitation. Pl.'s Br. (ECF No. 14, at 16-17). When determining whether the claimant is disabled, the ALJ must consider all subjective symptoms, including pain. 20 C.F.R. § 404.1529(a). The SSA defines a "symptom" as "[the claimant's] own description of [his] physical or mental impairment." Id. § 404.1502(i). Symptoms cannot establish disability alone. Id. § 404.1529(a). The ALJ must also consider the extent to which symptoms are consistent with objective evidence. Id.

When considering a claimant's testimony regarding symptoms, the ALJ must follow a two-step process. SSR 16-3p, 2016 WL 1119029, at *3-4 (Mar. 16, 2016). At step one, the ALJ assesses whether the claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms. Id. at *3. In doing so, the ALJ does not consider whether the objective medical evidence supports the severity of the claimant's symptoms. Id. If the ALJ finds no such medically determinable impairment, the claimant is not disabled. Id. at *4. If there is a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms, the ALJ proceeds to step two. Id. At this step, the ALJ evaluates the intensity and persistence of the claimant's symptoms and determines the extent to which such symptoms limit her ability to perform work-related activities. Id. The ALJ's determination "must contain specific reasons for the weight given to the [claimant's] symptoms, be consistent with and supported by the evidence, and be clearly articulated so . . . any subsequent review can assess how the [ALJ] evaluated the [claimant's] symptoms." Id. at *9.

In this case, the ALJ followed the two-step process and satisfied the foregoing standard. At step one, the ALJ found that Plaintiff's medically determinable impairments could be expected

22

to cause him symptoms. (R. at 28). However, at step two, the ALJ concluded that "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Id.) The ALJ went on to cite specific evidence in the record to explain that, despite Plaintiff's subjective complaints, he was capable of sedentary work with further limitations. (R. at 29-30).

After reviewing Plaintiff's medical history, which included severe obesity and chronic diagnosed knee conditions which were clearly shown on MRI imaging, the ALJ observed that he had no surgeries on his knee since the corrective procedure for his Blounts disease at age 15. (R. 29). He had treated his knee pain conservatively using only medication and despite referrals, did not follow up for specialized orthopedic treatment. (Id.) There were long gaps in the treatment record and no evidence that any doctor prescribed a cane or other assistive device. (Id.) The ALJ also cited medical records showing relatively benign physical examinations. (Id., citing R. 480-82, 575, 578).

In addition to the medical records, the ALJ also reviewed Plaintiff's reported activities – which, though limited, suggested he was capable of sedentary work. The ALJ again pointed to Plaintiff's self-report of assisting with household chores, his second story bedroom, and the fact that he did not use a cane to ambulate. (R. 29-30).

In arguing the ALJ failed to properly assess his credibility, Plaintiff points to objective medical evidence, including the MRI images, which showed severe arthritic changes in his right knee. It is true these medical findings corroborate Plaintiff's testimony – but they were not overlooked by the ALJ. He recited these findings in detail as part of his assessment and they inform his decision to partially credit Plaintiff's testimony, and impose a restrictive sedentary RFC finding. But it is not this court's function to reweigh the evidence. It is sufficient to note that the

ALJ did not ignore, or cherry pick only the evidence that supported his conclusion. Having evaluated all the evidence bearing on Plaintiff's credibility – his finding that Plaintiff's testimony was only partially credible is supported by substantial evidence.

For largely the same reasons, I do not find any error in the ALJ's analysis of the Plaintiff's girlfriend's testimony. The ALJ gave her testimony regarding Plaintiff's limitations only "moderate weight." (R. 32). Plaintiff argues that the ALJ relied on his dated self-report activities and a 2016 medical examination without considering contrary medical records. Pl.'s Br. (ECF No. 14, at 22). But this is not correct, the ALJ also relied on, and cited to records of his recent physical examinations from 2019. (R. 32, citing R. 570-87). As a result, his decision to only partially credit the third-party witness was also supported by substantial evidence.

**E.    The ALJ Did Not Err in Determining Whether Plaintiff's Impairments Met or Equaled an Impairment Listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.**

"The Social Security Administration has promulgated regulations containing 'listings of physical and mental impairments which, if met, are conclusive on the issue of disability.'" Radford v. Colvin, 734 F.3d 288, 291 (4th Cir. 2013) (quoting McNunis v. Califano, 605 F.2d 743, 744 (4th Cir. 1979)). These listings are found in 20 C.F.R. Part 404, Subpart P, Appendix 1, which defines impairments, "in terms of several specific medical signs, symptoms, or laboratory test results" that are severe enough to prevent a claimant from being unable to engage in any gainful activity. Sullivan v. Zebley, 493 U.S. 521, 530, 532 (1990) (citing 20 C.F.R. § 416.925(a) (1989) (purpose of listings is to describe impairments "severe enough to prevent a person from doing any gainful activity"); SSR 83-19, 1983 WL 31248, at *1 (Jan. 1, 1983)[3] (listings define "medical

---

[3] SSR 83-19 has been rescinded in part with respect to the procedures used to determine disability in children, but otherwise remains an accurate representation of the Social Security Administration's policies and regulations. See SSR 91-7c, 1991 WL 231791 (Aug. 1, 1991).

conditions which ordinarily prevent an individual from engaging in any gainful activity")). A claimant is entitled to this conclusive presumption of impairment "if he can show that his condition 'meets or equals the listed impairments.'" Radford, 734 F.3d at 291 (quoting Bowen v. City of New York, 476 U.S. 467, 471 (1986)); see also Bowen v. Yuckert, 482 U.S. 137, 141 (1987) ("If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled."). To meet the requirements of a listing, a claimant "must have a medically determinable impairment(s) that satisfies all of the criteria in the listing." 20 C.F.R. § 404.1525(d). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Zebley, 493 U.S. at 530 (citing SSR 83-19, 1983 WL 31248 (Jan. 1, 1983)).

Plaintiff asserts that "the ALJ failed to sufficiently explain why Plaintiff's impairments did not meet or equal Listing 1.03 which pertains to "reconstructive surgery or surgical arthrodesis of a major weight bearing joint, with inability to ambulate effectively . . . and return to effective ambulation did not occur, or is not expected to occur, within twelve months of onset." Pl.'s Br. (ECF No. 14, at 23 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.03)). According to Plaintiff, the ALJ did not consider whether Plaintiff met Listing 1.03, instead considering Listing 1.02.[4] See id. at 22-23. After considering the ALJ's opinion and the record as a whole, I conclude that the ALJ's review of the relevant listings is supported by substantial evidence.

In analyzing whether a listing is met, the ALJ is generally required to set forth the reasons for his decision. Diaz v. Comm'r of Social Sec., 577 F.3d 500, 504 (3d Cir. 2009) (citing Burnett v. Comm'r of SSA, 220 F.3d 112, 119 (3d Cir. 2000)). This includes identifying the applicable listing and comparing the claimant's symptoms to the criteria of the listing. Cook v. Heckler, 783

---

[4] Although he now cites Listing 1.03 as the relevant listing, during the hearing Plaintiff's counsel specifically directed the ALJ to Listing 1.02 and did not mention Listing 1.03. (R. 43-44). Nonetheless, the ALJ's analysis encompassed all the listings under category 1.00 related to the musculoskeletal system. (R. 26).

F. 2d 1168, 1173 (4th Cir. 1986); see also Russell v. Chater, 60 F.3d 824, 1995 WL 417576, at *3 (4th Cir. 1995) (unpublished table opinion) (noting that the ALJ is not held to "an inflexible rule requiring an exhaustive point-by-point discussion in all cases").

Here, the ALJ's opinion first pointed generally to Listing 1.00 which comprises impairments related to the Musculoskeletal System, then specifically to Listing 1.02 (as Plaintiff's counsel had argued). (R. 26, 43). In fact, Listing 1.00 includes several sub-listings: 1.02 (major dysfunction of a joint), 1.03 (reconstructive surgery or surgical arthrodesis of a major weight-bearing joint), 1.04 (Disorders of the spine), 1.05 (amputation), 1.06 (fracture of the femur, tibia, pelvis, or one or more of the tarsal bones), 1.07 (Fracture of an upper extremity), and 1.08 (soft tissue injury). 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00. To satisfy the criteria for any of the relevant Listings under 1.00, a person must experience "functional loss," defined as "the inability to ambulate effectively on a sustained basis." Id. § 1.00(B)(2)(a). An "inability to ambulate effectively" means "an extreme limitation of the ability to walk," and is generally defined as requiring the use of a hand-held device that "limits the functioning of both extremities." Id. § 1.00(B)(2)(b)(1). Some examples of ineffective ambulation include "the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail." Id. § 1.00(B)(2)(b)(2).

Here, the ALJ's opinion provides a sufficient basis to support his conclusion that the Plaintiff's impairments did not meet or equal Listing 1.03, 1.02 or any other impairment listed under section 1.00. As the ALJ noted, Plaintiff did not use a cane or walker, and his doctor has not prescribed one or indicated he would need one for occasional standing or walking. (R. 26).

26

Plaintiff argues this finding is contradicted by testimony from him and his girlfriend that he was unable to ambulate effectively, as he required a scooter when shopping and could not walk without pain. Pl. Br. (ECF No. 14, at 24). But neither Plaintiff nor his girlfriend testified that he required a walker or two canes to ambulate. Both stated that he visited her nearly every day – at her second-floor apartment. Plaintiff himself said he could walk up to 30 yards, had not been prescribed a cane, and had never fallen as a result of his knee pain. (R. 51, 53). Based on the medical record – which he cited in his opinion – and evidence from both witnesses, the ALJ determined that Plaintiff did not experience an inability to ambulate effectively as required to meet any relevant Musculoskeletal System Listing under 1.00. Because Listing 1.03 – like Listing 1.02 – requires a claimant to establish an inability to ambulate effectively, the ALJ's opinion, read as a whole, provides substantial evidence to support his decision that Plaintiff does not meet or equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

## V.     RECOMMENDATION

For the foregoing reasons, this Report recommends that the Court DENY Plaintiff's Motion for Summary Judgment (ECF No. 13), GRANT the Commissioner's Motion for Summary Judgment (ECF No. 15) and AFFIRM the final decision of the Commissioner.

## VI. REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.     Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of

the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. See Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.    A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/

Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia

April 2, 2021